6893

STURGISS v. ATLANTIC COAST LINE R. R. CO.

1. CONSTITUTIONAL LAW—RELIEF DEPARTMENT.—If the statute, 24 Stat., 962, be so construed as to permit an employee, who has become a member of a relief department of his employer in which contract the employee has stipulated if he or his representatives bring action against his employer for injury or death caused by the negligence of the employer, then all obligations due him by such department shall be forfeited, to sue and recover of his employer full compensation for injury to him by the negligence of the employer, and then to also enforce his claims against the employer under the relief contract, it is unconstitutional as unreasonably abridging the right to contract.

Court divided. Held, not settled.

2. RELIEF DEPARTMENT.—The provisions in a relief department contract that in case of physical inability to work the employee is to receive one

dollar per day for fifty-two consecutive weeks, and one-half that sum so long as his inability to work continues, means inability to do the work he was engaged in when injured.

3. REHEARING refused.

Before PURDY, J., Charleston, August, 1907. Affirmed.

Action by J. R. Sturgiss against Atlantic Coast Line R. R. Co. The following is the circuit decree after stating the issues:

"In view of the nature of the issues presented, a brief statement of the character and workings of the Relief Department will be necessary. I find from the evidence submitted that the defendant company operates, in conjunction with its employees, what is commonly known as a relief and hospital department or association. Employees entering the service of the company become members of this association and make monthly contributions to its relief fund, the amount of the contribution varying according to the class of membership, which is graded by the rate of salary an employee draws. The railroad company acts as treasurer of this fund, paying interest thereon, and, in addition, assumes the entire management of the department, paying all its expenses, and guarantees to make good all its obligations, which at this time are shown to be many times larger than the relief fund actually on hand in the department. From the relief fund so maintained by the defendant company and its employees death benefits are paid to the members, whether death results to a member from accident, sickness or other cause, and whether an accident causing death is due to the negligence of the company, the negligence of the member, or otherwise. In addition to this, members in case of sickness from any cause receive free medical and surgical treatment in the hospitals maintained by the department, and sick dependent members of the family of a member are accepted for treatment in such hospitals at special rates.

"In the contract of membership in the Relief Department, and in Rule 65 of the Regulations, it is stipulated that after injury a member may either accept benefits or bring his action at law for damages, but if he elects to accept benefits, such acceptance shall operate as an accord and satisfaction of all claims he may have against the company growing out of the accident, and if he elects to sue for damages he shall thereby forfeit all right to receive benefits.

"From the stipulation heretofore set out it appears that plaintiff has already recovered a judgment against defendant on account of this very injury, and is now seeking to recover the benefits from the Relief Department in addition thereto. If the contract with the Relief Department is valid, then the judgment in favor of plaintiff is a bar to this action. But against this, plaintiff offers the act of the General Assembly of South Carolina in effect making a contract of the kind in question null and void. In reply to this, defendant contends that said act of the General Assembly is in contravention of Article XIV of the Amendments to the Constitution of the United States, and of Section 5 of Article I of the Constitution of the State of South Carolina, in that it is an illegal interference with the liberty of contract, and is therefore void.

"1. This brings us to the first and main issue in the case, namely: Is the act of the General Assembly of South Carolina allowing a member of the Relief Department to recover benefits, in addition to compensation in damages, constitutional?

"The statute whose validity is here drawn in question was enacted on March 7, 1905 (24 Stat., 962), and is as follows (set out in opinion of court):

"A similar statute, applying exclusively to relief departments operated by railroads, had been enacted at the session of 1903 (24 Stat., 79), but this, I hold, was repealed by the later act of 1905. My reasons for so holding are twofold: First, the act of 1903 was intended 'to regulate and

fix the liability of railroad companies having a relief department,' while the purpose of the act of 1905 was 'to fix and declare the liabilities of any corporation, firm or individual operating a relief department.' The word 'corporation,' found in the act of 1905, is a generic term, embracing every species of corporation, including railroads. The subject-matter and rules prescribed by the two acts are identical; therefore, under the principle that the later of two statutes on a given subject fully embracing the whole subject-matter repeals the first, the act of 1903 was repealed by the act of 1905. *Johnson* v. *Railway Co.,* 69 S. C., 326, 48 S. E., 260, and cases cited. Second, the act of 1903, applying as it did exclusively to railroads, was open to the objection of being class legislation, and this objection the legislature evidently recognized and intended to remove by enacting a second statute on the same subject applying alike to corporations, firms and individuals.

"The act of 1905, therefore, only need be considered in this case.

"The provision of the contract with the Relief Department, at which this statute is aimed, is that already referred to wherein the member agrees that in case of injury he may elect either to sue the company for damages or to accept benefits from the Relief Department, but an election to do either, when fully carried out, shall operate as a forfeiture of all right to the other. The first question, then, is whether, in the absence of this statute, such a provision would be valid.

"That a common carrier can make no contract exempting itself from liability for the consequences of its own negligence is a principle so well established as to need the citation of no authority to support it; but that principle is wide of the mark here. If the provision of the Relief Department contract in question were to the effect that *mere membership in the association and the right to receive benefits* should of themselves release the company from liability,

then I concede that it would be a contract against liability for future negligence, and consequently void; but *such are not it terms.* On the contrary, as I view it, it can in no way be considered a contract against future negligence. The injured member, or the beneficiaries of a member that has been killed, are not required to forego a single right that they may have, but are freely left to an option either to sue for damages or to accept benefits, and it is only the *election after injury or death* that is binding. As is well known, in a majority of cases injuries to employees are due solely to their own negligence or contributory negligence, or to the negligence of a fellow-servant, and for such cases the law allows no recovery. But under a relief department of the character operated by defendant, all persons so injured receive their full benefits. Again, there must naturally be a large number of cases of doubtful liability on the part of the employer, and for all these the Relief Department affords a sure compensation; whereas a suit for damages might be barren of results. In addition, the family or other beneficiaries of a member receive full benefits in case of his death, whether the death result from natural causes or an accident for which the company is or is not responsible. All these different cases are constantly arising, not to speak of the daily sick benefits and *free* medical and surgical attention given to all members, whether their illness arises from sickness or accident. An association that thus provides for cases where the law can afford no relief, and furnishes medical and surgical aid for those whose means would deny them such attention, and for whose condition the employer is in no wise responsible, surely is worthy of the highest commendation and fullest protection.

"Under the Relief Department contract, an injured member has two remedies open to him. He may either pursue his remedy by a suit for damages and risk his chances for compensation on the uncertainties of litigation, coupled as

it is with vexatious delays and the heavy expense of court costs and counsel fees, or he may accept his certain benefits from the Relief Department. If his injury is severe, he may be wise to sue; and *there is absolutely nothing in the contract to prevent him from so doing.* With two reme- dies open to him, where only one existed before, he elects to accept benefits from the Relief Department. His contract is not completed *until after the injury is received,* and the company is not released until the election is made. If he accepts the Relief Fund, it is nothing more than a settle- ment of his claim by compromise, and I know of no reason why such a settlement should be any more against public policy than any other release by way of compromise after the infliction of an injury. Indeed, the policy of the law is always to encourage the settlement of claims in good faith. For similar reasons, I see no reason why he should not be bound by his election to pursue his remedy by a suit for damages, for in so doing he renounces any right to settle by compromise by acceptance of benefits, and it is out of all justice and reason that he should be allowed to repudiate his election and receive double compensation.

"Independently of authority, therefore, I should be con- strained to hold the provision of the contract drawn in question not only perfectly valid, but eminently reasonable and proper. .

"The conclusion I have reached is not only supported by reason, but is amply sustained by authority. Out of some- thing like nearly forty cases in this country and England discussing the question, only two, so far as I have been able to find, and so far as plaintiff's counsel has brought to light, have held the contract invalid, and both of these have been subsequently overruled; so that now the author- ities present a solid front in favor of its validity. I quote from a few of the leading cases.

"The question came before the Supreme Court of this State in *Johnson* v. *Railway Co.,* 55 S. C., 152, 44 L. R.

A., 645, 32 S. E., 2, and the validity of the contract was upheld by a divided Court, Chief Justice McIver delivering the prevailing opinion.   The language of the Chief Justice is so pertinent that I make an extended extract therefrom:

" 'In the outset I desire to say, what would seem to be needless but for the fact that it appears to have been thought necessary to expend much time and labor upon the point, that I do not suppose any one doubts that a contract whereby a railroad corporation, or any other common carrier, undertakes to secure immunity from liability for damages for injuries resulting from the negligence of the carrier, or any of his servants and agents, is contrary to public policy, and therefore void.   But the question here is whether the contract or arrangements set up in the affirmative defense is a contract for immunity from damages.   I do not think it can be so regarded; for, on the contrary, *the very terms of the contract necessarily assume that the defendant is liable; and the whole scope and effect of the contract is to fix the measure of such liability and the manner in which such liability shall be satisfied.*   As is well said in one of the cases cited—*Johnson . v. Railroad Co.,* 163 Pa. St., 127; "He (referring to the plaintiff) is not agreeing to exempt the company from liability for negligence, but accepting compensation for an injury already caused thereby."   How such a contract can be construed to be a contract whereby the carrier seeks to obtain *immunity* from liability for damages sustained by reason of its own negligence, or that of its servants or agents, it is impossible for me to conceive.   Let us examine in detail the terms of the contract or arrangement as set out in the affirmative defense, and see whether such terms do not fully justify what I have said as to its scope and effect.   It seems that the defendant company is one of several railway companies constituting what is called the Plant System, in which there is an organization called the Relief and Hospital Department, established for the purpose of raising a fund for the payment of

specified amounts to any employee contributing to the fund, when he is disabled by accident or sickness, and to his family in the event of his death. This fund is raised by stated contributions from the employees, from the Plant System, from income that may be derived from investments of the fund and from appropriations made by the Plant System when necessary to make up a deficit in the fund. It is alleged in the affirmative defense that the plaintiff applied for membership in the said Relief and Hospital Department, and in his application agreed to be bound by all of the regulations of said department, and further agreed that, in consideration of the contributions from the companies composing the Plant System to said fund, and of the guaranty by them of the payment of the benefits aforesaid, the acceptance of such benefits should release the said companies and each of them from all claims for damages sustained by reason of any injury that such employee might sustain. It is further alleged that as soon as the plaintiff sustained the injury complained of in this case, he immediately applied for and obtained from the said Relief and Hospital Department all the benefits to which he was entitled under the regulations of such department, as well in money as in surgical and medical services, care and treatment in the hospital, free of any charge therefor; and that the plaintiff, in consideration thereof, duly executed, under his hand and seal, receipts therefor, and a release of all claims for damages or other form of compensation which he might have against the defendant company. From this statement of the nature and terms of the contract or arrangement in question, which substantially covers the allegations made in the second affirmative defense, to which alone the demurrer was directed, which allegations must, in considering the demurrer, be accepted as true, I do not see how it is possible to regard such contracts as a contract exempting the defendant company from liability for damages sustained by reason of the negligence of the defendant company, or that

of its servants or agents.    By entering into this contract, evidenced by his becoming a member of the Relief and Hospital Department, the plaintiff did not waive or release any right of action which he might thereafter have against the defendant company, but his contract was that, *if after receiving an injury* at the hands of the company, he accepted the benefits which he would be entitled to claim by virtue of his membership of such department, *such acceptance should operate as a release of any right of action which he might otherwise have against the company.    So that by the terms of the arrangement the plaintiff, *after he sustained the injury,* had his election either to accept the benefits which, as a member of the Relief and Hospital Department, he would be entitled to claim, or to decline to receive such benefits.    *If he accepted,* he was then bound to release the company; but *if he declined,* he was not bound to release the company, but retained his right of action just as if he had never become a member of the Relief and Hospital Department.    If it should be said that this seems to be a one-sided arrangement, as the plaintiff, if he declined to accept the benefits, would lose the amount which he had contributed to the Relief and Hospital Department fund, this seeming one-sidedness disappears when it is considered that by the terms of the arrangements the plaintiff would be entitled to the benefits of the fund and to medical or surgical services, and to care and treatment in the hospital, free of any charges therefor, even if his disability arose from sickness, from natural causes or from injuries for which the railroad company could not be held responsible.    Furthermore, inasmuch as the plaintiff had the right of election, *after the injury was sustained,* either to sue for damages or to claim the benefits of the Relief and Hospital Department, he could, if the injury was slight, accept the benefits of the Relief and Hospital Department as satisfactory compensation for the injury, but if the injury was serious, calling for greater compensation than would be afforded by the bene-

fits which he might claim, he could exercise his right to sue for damages; so that it seems to me that the arrangements, properly understood, *would be favorable rather than detrimental to the interests of the employee.'*

"In *Leas* v. *Pennsylvania R. Co.,* 37 N. E., 423 (Ind.), the question came before the Supreme Court of Indiana, and was disposed of thus:

" 'It may be truly said, we think, by virtue of the contract and release pleaded in the answer before us, the appellee was enabled to discharge its liability by the payment of a much smaller amount of damages than the appellant might have been able to recover in this action upon the alleged tort, had it not been for the contract and acceptance of benefits and that thus, in a certain sense, the appellee will succeed in at least curtailing its liability by a contract made in advance of the injury. But, notwithstanding the contract made with the employee in advance of the injury, the fact remains true that the appellant was in no sense compelled to receive the compensation growing out of the relief fund, and that *when he did so, he practically made a new contract with the company, by which he agreed to accept the amount offered him in full satisfaction of the damages.* Having placed himself in this predicament, he is in no position to require the courts to extricate him therefrom. The rule that an employer can not exempt himself from liability arising from injury to his employee on account of the employer's negligence, by a contract entered into between the two at a time prior to the injury, is, therefore, not applicable.   *   *   *

" 'Nor is it easy to perceive upon what principle the contract can be held void from considerations of public policy. *There is no rule of public policy which discourages the settlement of claims of this character by compromise, when made in good faith;* and, as we have seen, *the payment and acceptance of the benefit money in the present case was nothing more nor less than an adjustment and compromise*

*of the claim after injury.* Besides, *the general beneficial results inuring to a member of this association are such as to commend it to public favor rather than otherwise.* Membership in the Relief Association not only enables the employees who take advantage of it to relieve their pecuniary wants in the early periods of disability arising from injury received in the company's service, and from ordinary disease or illness, but such relief is continuous as long as the member is in good standing, excepting a reduction of one-half after the first year, until the death of the member, and, even then, his family or other beneficiaries are entitled to draw death benefits; and all the funds needed for the payment of these are guaranteed by the company. There certainly could be no just ground upon which the general contract of membership and its resulting benefits could be held void as against public policy. The only basis upon which such a claim could stand for a moment is 'that portion of the contract by virtue of which the acceptance of benefits operates as a release of the company, is an attempt to contract against liability for negligence in advance of an injury. The impediment in the way of such a conclusion, however, is that the contract out of which the release arises is really not concluded *until after the injury,* and that the same is based upon a consideration paid and voluntarily accepted, also *subsequently to the injury;* and *these several acts constitute the contract, a compromise between the parties, which is not obnoxious to, but favored by, considerations of public policy.'* (Italics added.)

"And in *Johnson* v. *Philadelphia, etc., R. Co.,* 29 Atl., 854 (Pa.), the Supreme Court of Pennsylvania ruled:

" 'It is further objected—and that is the only substantial question in the case—that the release was void as against public policy, and a number of cases are cited to show that a common carrier can not make a valid contract against his own negligence. It was quite unnecessary to go out of our own State for authority on that proposition. It is not ques-

tioned here any more than elsewhere, but it is wide of the point in this case. There is no provision exempting the company from liability for future negligence. The benefits, by the regulations of the Relief Association, become due to members whenever disabled by accident in the railroad company's service, or by sickness or injury other than in the company's service, without reference to the question of negligence at all. As these provisions include benefits in cases of accident pure and simple, of injury by the negligence of fellow-workmen, and by the member's own contributory negligence, it is apparent that they cover a wide field, in which there is no liability of the railroad company at all. Such cases are probably a large majority of those occurring to railroad employees, and *the association, therefore, is of the highest order of beneficial societies.* But, even in cases of injury through the company's negligence, there is no waiver of any right of action that the person injured may thereafter be entitled to. It is not the signing of the contract, *but the acceptance of benefits after the accident,* that constitutes the release. *The injured party, therefore, is not stipulating for the future, but settling for the past. He is not agreeing to exempt the company from liability for negligence, but accepting compensation for an injury already caused thereby.* He may as well accept it in installments as in a single sum, and from an appointed fund to which the company has contributed, as from the company's treasury as the result of litigation. The substantial feature of the contract, which distinguishes it from those held void as against public policy, is that *the party retains whatever right of action he may have until after knowledge of all the facts and an opportunity to make his choice between the sure benefits of the association or the chances of litigation.* Having accepted the former, he can not justly ask the latter in addition. This feature of the case brings it on all-fours with *Graft* v. *R. Co.* (Pa. Sup.), 8 Atl., 206, where a release under similar circumstances was held to be a conclusive bar.

There is no public policy which the contract can be said to transgress.' (Italics added.)

"In Nebraska the question arose in *Chicago, B. and Q. R. Co.* v. *Bell*, 62 N. W., 314 (Neb.), and was thus disposed of:

" 'The acts of Bell, in becoming a member of the Relief Department, and executing the contract under consideration, did not and do not bar his right of action against the railroad company for negligently injuring him. In other words, by becoming a member of the Relief Department, and by executing the release in question, he did not waive nor bar any cause of action which might thereafter arise in his favor against the railroad company by reason of being injured or killed through the negligence of the railroad company or its employees. *It was his action in accepting payments from the Relief Fund, after he was injured, and after his cause of action arose against the railroad company, that now estops him.* Notwithstanding his agreement and his membership in the Relief Department, whatever right of action he had against the railroad company for the injury he received remained unaffected by such membership and agreement. But *after his injury, after his cause of action arose,* he made his choice between the benefits which he could and did receive from the Relief Department and what he might obtain by litigation; and, so far as this record shows, he made such choice knowingly, deliberately and without fraud, coercion or mistake, and he must be bound thereby. *Leas* v. *Penn. Co.,* 37 N. E., 423. The expression "contrary to public policy" we suppose means good public policy. This phrase has no fixed legal significance. It varies and must vary with the changing conditions and laws of civilizations and peoples. *But we have been unable to discover anything in the contract, made the subject of defense in this action, unconscionable, contrary to law, or subversive of morals or good government.'* (Italics added.)

"So the Supreme Court of Ohio, in *Pittsburg, etc., R. Co.* v. *Cox,* 45 N. E., 641, 35 L. R. A., 507, answers the objections to the contract in these words:

" 'Is the contract itself against public policy? To be so, it must in some manner contravene public right or the public welfare. It must be shown to have a mischievous tendency as regards the public. And this should clearly appear. * * * But this claim arises, we think, from a misconception of the contract—in assuming that, by the contract, the employee releases some future right of action against the company. On a previous page we have undertaken to show that such is not the case; that there is no waiver of any cause of action which the employee may become entitled to, and that *it is not the signing of the contract, but the acceptance of benefits after the accident, that constitutes the release. When that occurs, he is not stipulating for the future; he is but settling for the past. He accepts compensation for injury already received.* * * * Then he elects between the Relief Fund and the treasury of the company—between a relief sure, immediate and continuous and one depending upon the hazards of litigation and certain to be delayed. If he is injured, and the company is not liable (a condition which follows in much the larger proportion of the accidents to employees on railroads), he may accept the benefits; if the company is liable, he may decline benefits and sue. How can this injuriously affect the public? Is it not, on the other hand, a wise and humane provision for many of a class who, without it, when sick or injured, would be compelled to look to public charity for aid? And does it not hold out an incentive to faithful, efficient service by encouraging expectation of benefits when the member becomes superannuated, and encourage economy and thrift by laying up something against a time of need?' (Italics added.)

"In *Pittsburg, etc., R. Co.* v. *Moore,* 44 L. R. A., 698 (Ind.), it was contended that the Relief Department contract contravened the Indiana statute forbidding a railroad

company to contract against its own negligence. Answering this contention, the Court fully reviewed the authorities and said:

" 'The contract forbidden by the statute is one relieving the company from liability for the future negligence of itself and employees. The contract pleaded does not provide that the company shall be relieved from liability. It expressly recognizes that enforcible liability may arise, and only stipulates that if the employee shall prosecute a suit against the company to final judgment, he shall thereby forfeit his right to the Relief Fund, and, if he accepts compensation from the Relief Fund, he shall thereby forfeit his right of action against the company. *It is nothing more nor less than a contract for a choice between sources of compensation, where but a single one existed, and it is the final choice—the acceptance of one against the other—that gives validity to the transaction.'* (Italics added.)

"In this case the Court overruled its previous decision in *Railway Co.* v. *Montgomery*, 49 N. E., 582.

"The Court, in *Eckman* v. *Chicago, B. and Q. R. Co.*, 38 L. R. A., 750 (Ill.), thus states the reasons for upholding the contract:

" 'In every case of injury the injured party has the right to compromise the damages for any valuable consideration, no matter how small, and if he chooses to accept a smaller amount than he might have been able to secure at the hands of a jury, such settlement is, nevertheless, a full accord and satisfaction and a bar to the prosecution of any suit for damages for such injuries. It is well known that the railroad companies frequently compromise such suits out of court, and such compromises are always upheld, if honestly and fairly made. * * *

" 'It is not this agreement alone that constitutes the release, *but the acceptance of the benefits therein stipulated,* well knowing that the acceptance of such benefits will have the effect of a release. * * * The agreement is not against

public policy, as it merely puts the employee to his election, *after an injury has been sustained by him,* either to take the benefits of the Relief Fund, to which the appellee has materially contributed, or to sue for damages in a court of law.' (Italics added.)

"And in *Otis* v. *Pennsylvania Co.,* 71 Fed., 136, Judge Baker has this to say:

" 'Upon a careful examination it will be seen that it contains no stipulation that the plaintiff should not be at liberty to bring an action for damages in case he sustained an injury through the negligence of the defendant. *He still had as perfect a right to sue for his injury as though the contract had never been entered into.* * * * *After the injury happened,* two alternative modes were presented to him for obtaining compensation for such injury. With full opportunity to determine which alternative was preferable, he deliberately chose to accept the stipulated benefits. There was nothing illegal or immoral in requiring him to do so. And it is not perceived why the Court should relieve him from his election in order to enable him now to pursue his remedy by an action at law, and thus practically to obtain double compensation for his injury. Nor does the fact that the fund was in part formed by his contributions to it alter the case. The defendant also contributed largely to the fund under its agreement to make up deficits, to furnish surgical aid and attendance, to pay expenses of administration and management, and to become responsible for the safekeeping of the funds of the Relief Department. It had a large pecuniary interest in the very money which the plaintiff received. We are not concerned with the question whether the plaintiff might not have secured a larger sum of money if he had prosecuted his legal remedy for the recovery of damages for his injury. *After the injury* the plaintiff was at liberty to compromise his right of action with the defendant for any valuable consideration, however small'; and if he chose to accept a less amount than that

which he might have recovered by action, such settlement, if fairly entered into, constitutes a full accord and satisfaction, from which *the Court can not and ought not to relieve him.'* (Italics added.)

"Quotations of equal force and clearness, both from the text-writers and the decided cases, could be multiplied, but I feel that they would only serve to lengthen this opinion unduly, and hence content myself by merely referring to them: 3 Elliott on Railroads, Secs. 1381-1384; *Graft* v. *B. and O. R. Co.,* 8 Atl., 206 (Pa.); *Fuller* v. *B. and O. R. Co.,* 10 Atl., 237 (Md.); *Chicago, B and Q. R. Co.* v. *Wymore,* 58 N. W., 1120 (Neb.); *Ringle* v. *Pennsylvania Co.,* 44 Am. St. Rep., 628 (Pa.); *Donald* v. *Chicago, B. and Q. R. Co.,* 33 L. R. A., 493 (Ia.); *Maine* v. *Chicago, B. and Q. R. Co.,* 70 N. W., 630 (Ia.); *Chicago, B. and Q. Co.* v. *Curtis,* 66 Am. St. Rep., 456 (Neb.); *Pittsburg, etc., R. Co.* v. *Hosea,* 53 N. E., 419 (Ind.); *Beck* v. *Pennsylvania Co.,* 76 Am. St. Rep., 211 (N. J.); *Clinton* v. *Chicago, B. and Q. R. Co.,* 84 N. W., 90 (Neb.); *Oyster* v. *Burlington Relief Department,* 59 L. R. A., 291 (Neb.); *State* v. *Pittsburg, etc., R. Co.,* 64 L. R. A., 405 (Ohio); *Petty* v. *Brunswick, etc. R. Co.,* 35 S. E., 82 (Ga.); *Pennsylvania R. Co.* v. *Chapman,* 77 N. E., 248 (Ill.); *Chicago, B. and Q. R. Co.* v. *Bigley,* 95 N. W., 344 (Neb.); *Chicago, B. and Q. R. Co.,* v. *Olson,* 97 N. W., 831 (Neb.); *Walters* v. *Chicago, B. and Q. R. Co.,* 104 N. W., 1066 (Neb.); *Chicago, B. and Q. R. Co.* v. *Heady,* 107 N. W., 1005 (Neb.); *Owens* v. *B. and O. R. Co.,* 1 L. R. A., 75 (Fed.); *Black* v. *B. and O. R. Co.,* 36 Fed., 655; *Vickers* v. *Chicago, B. and Q. R. Co.,* 71 Fed., 139; *Shaver* v. *Pennsylvania Co.,* 71 Fed., 931; *Hamilton* v. *St. Louis, etc., R. Co.,* 118 Fed., 92; *Cannady* v. *R. Co.,* Supreme Court of North Carolina, 1906; *Harrison* v. *Alabama Midland R. Co.,* Supreme Court of Alabama, 1906.

"The contrary views referred to above were taken in *Miller* v. *Chicago, B. and Q. R. Co.,* 65 Fed., 305, and *Mont-*

*gomery* v. *Pittsburg, etc., R. Co.,* 49 N. E., 582 (Ind.). The first of these was distinctly disapproved on appeal (76 Fed., 439), as was shown by Chief Justice McIver in *Johnson* v. *Ry. Co., supra.*   It was also disapproved in *Vickers* v. *R. Co., supra,* and in *Eckman* v. *R. Co., supra.*   The second, as we have already seen, was squarely overruled in *Pittsburg, etc., R. Co.* v. *Moore,* 53 N. E., 290 (Ind.).

"In England I find the contract has been before the courts at least twice: first in *Griffith* v. *Earl of Dudley,* 9 Q. B. Div., 357, and again in *Clements* v. *R. Co.,* 2 Q. B., 482 (1894), and in each case it was sustained by an exceptionally well-reasoned opinion.

"In addition to holding the contract valid as not being against public policy, the authorities are clear to the effect that it is supported by a consideration, and is not void for lack of mutuality.   The following quotation from 3 Elliott on Railroads, Section 1383, so clearly states the reasons for so holding, and so nearly fits the facts of this case, that I quote it without further comment:

" 'By becoming a member of the Relief Department the employee receives benefits, if he chooses to accept them and release the company, not only where he is injured by the negligence of the company, but also where the company is guilty of no negligence, and, indeed, for mere sickness, with causing which the company has nothing to do.   All this he may receive without the expense and uncertainty of litigation with the company.   The railroad company's contribution to the association, and its guaranty of its obligations, also constitute a consideration moving to every member of the association.   It can not be said, therefore, that there is no consideration for the agreement of the employee, nor can it be said that there is no mutuality in the contract. Indeed, under the old equity rule, which has been adopted in most of the States, a promise to one for the benefit of a third person may be enforced by the latter, no matter whether the consideration moves directly from him or not,

and *where the contract is completed by accepting benefits from the Relief Fund after the injury has been inflicted, it would be a strange doctrine that would permit the employee to repudiate it upon the ground of want of consideration or mutuality.'* (Italics added.)

"Cases sustaining the text are: *Leas* v. *Penn. Co.,* 37 N. E., 423 (Ind.); *Chicago, B and Q. R. Co.* v. *Bell,* 62 N. W., 324 (Neb.); *Otis* v. *Penn. Co.,* 71 Fed., 136; *Chicago, B. and Q.* v. *Miller,* 76 Fed., 439; *Ringle* v. *Penn. Co.,* 44 Am. St. Rep., 628 (Pa.); *Pittsburg, etc., R. Co.* v. *Cox,* 35 L. R. A., 507 (Ohio); *Beck* v. *Penn. Co.,* 76 Am. St. Rep., 211 (N. J.); *Petty* v. *Brunswick, etc., R. Co.,* 35 S. E., 82 (Ga.); *Eckman* v. *Chicago, B. and Q. R. Co.,* 38 L. R. A., 750 (Ill.).

"In the light of these authorities, the conclusion is inevitable that the provision of the contract under consideration is not only not against public policy, but eminently beneficial to the only portion of the public interested in it.

"Since it is clear that the contract is not against public policy, the question is whether it can be prohibited by statute. If such statute can be shown to be a legitimate exercise of the police power, it will be upheld; if not, it must fall.

"The police power of the State is limited to such enactments as have some reasonable tendency to promote the public health, safety, morals, welfare or convenience, but the Legislature cannot, under the guise of police regulations, arbitrarily invade personal rights or liberty. In order to establish the validity of a law enacted under the police power, it must appear to the Court, first, that the end in view is the promotion of some or all of these objects; and, second, that the law is appropriate and reasonably necessary to that end. Thus, in *Mugler* v. *Kansas,* 123 U. S., at p. 661, 31 L. Ed., 205, it is said:

" 'If, therefore, a statute purporting to have been created to protect the public health, the public morals or the public safety has *no real or substantial relation to those objects,*

or *is a palpable invasion of rights secured by the fundamental law,* it is the duty of the courts to so adjudge and thereby give effect to the Constitution.' (Italics added.)

"Again, in *Lawton* v. *Steele,* 152 U. S., at p. 137, 38 L. Ed., 385, the same court says:

" 'To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the *public generally,* as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations.' (Italics added.)

"To the same effect are: *Lochner* v. *New York,* 198 U. S., 45, 49 L. Ed., 937; *Railway Co.,* v. *Smith,* 173 U. S., 684, 43 L. Ed., 858; *In re Marshall,* 102 Fed., 323; *In re Wilshire,* 103 Fed., 620; *Lake View* v. *Rose Hill Cemetery Co.,* 22 Am. Rep., 71 (Ill.); *Eden* v. *People,* 52 Am. St. Rep., 365 (Ill.); *Ruhstrat* v. *People,* 76 Am. St. Rep., 30 (Ill.); *Ritchie* v. *People,* 46 Am. St. Rep., 325 (Ill.); *People* v. *Gillson,* 4 Am. St. Rep., 465 (N. Y.).

"Judge Earl, in the great case of *In re Jacobs,* 98 N. Y., 98, 50 Am. Rep., 636, after an exhaustive examination of the subject, states the limitations of the police power in these words:

" 'These citations are sufficient to show that the police power is not without limitations, and that in its exercise the Legislature must respect the great fundamental rights guaranteed by the Constitution. If this were otherwise, the power of the Legislature would be practically without limitation. In the assumed exercise of the police power in the interest of the health, the welfare or the safety of the public, every right of the citizen might be invaded, and every constitutional barrier swept away. Generally it is

for the Legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these *ends,* the exercise of its discretion is not subject to review by the courts. *But they must have some relation to these* ends. Under the mere guise of police regulations personal rights and private property cannot be arbitrarily invaded, and the determination of the Legislature is not final or conclusive. If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the Courts to scrutinize the act and see whether it really relates to and is convenient and appropriate to promote the public health. It matters not that the Legislature may, in the title to the Act, or in its body, declare that it is intended for the improvement of the public health. Such a declaration does not conclude the Courts, and they must yet determine the fact declared and enforce the supreme law.' (Italics added.)

"Before a statute infringing on liberty to contract, which is one of the inalienable rights of man, can be sustained by the Courts, it must appear that such restraint of liberty is for the *common public welfare,* and equal protection and benefit of the people; or, as was said in *Palmer v. Tingle,* 45 N. E., 315 (Ohio): 'It must be so clear that a court of justice, in the calm deliberation of its judgment, can see that the restraint is for that purpose.'

"Judge Christiancy, of the Supreme Court of Michigan, thus well expressed the rule in *People* v. *J. and M. P. R. Co.,* 9 Mich., 307:

" 'Nor do I think it can be justified as a police regulation, under what is usually denominaed the police power. Powers, the exercise of which can only be justified on this specific ground, and which would otherwise be clearly prohibited by the Constitution, can only be such as are so clearly necessary to the safety, comfort or well-being of society, or

so imperatively required by the public necessity as to lead to the rational and satisfactory conclusion that the framers of the Constitution could not, as men of ordinary prudence and foresight, have intended to prohibit their exercise · in the particular case, notwithstanding the language of the prohibition would otherwise include it.'

"Since it is settled law that the police power of the State can never go beyond the great principle of protecting the public welfare, safety, health, morals or convenience, if a statute purporting to be enacted for the promotion of any of these objects has no real or substantial relation to them, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts so to adjudge.    Any law which undertakes to abolish rights, the exercise of which does not involve the infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and general security, cannot be included in the police power of the government.    State v. Kreutzberg, 91 Am. St. Rep., 934 (Wis.), and authorities cited; State v. Ashbrook, 77 Am. St. Rep., 765 (Mo.); Smiley v. McDonald, 47 Am. St. Rep., 659 (Neb.); Beebe v. State, 63 Am. Dec., 391 (Ind.); Iler v. Ross, 57 L. R. A., 895, 97 Am. St. Rep., 676 (Neb.); Chicago, etc., R. Co. v. State, 41 L. R. A., 481, 53 Am. St. Rep., 557 (Neb.).

"Not only must statutes purporting to be enacted under the police power fall within the recognized objects of that power, but they must have reference to matters of *public* as distinguished from *private* concern.    In other words, it must appear that the interests of the *public generally*, rather than of a particular class, require such interference.    *Law-ton* v. *Steele*, 152 U. S., 137, 38 L. Ed., 385; *In re Morgan*, 77 Am. St. Rep., 269 (Col.); *Colon* v. *Lisk*, 60 Am. St. Rep., 609 (N. Y.); *Young* v. *Commonwealth*, 45 S. E., 327 (Va.); *State* v. *Dalton*, 84 Am. St. Rep., 818 (R. I.); Cooley's Const. Lims. (7th ed.), 838.

"The statute here under consideration is not an act purporting to affect the *public generally* in the exercise of the police power, but it is an act seeking to make a new contract between the parties. It will not do to say that it is not contrary to public policy to maintain the Relief Department, letting it stand *as a department,* and yet so change it as to make it wholly a contract for the benefit of the member and wholly against the interests of the company. An effort thus to change the Relief Department so as to make it wholly in favor of the member, although the company contributes so largely in many ways to its support, is just as effectual a prohibition of the Department contract as if made in express words; for nothing short of coercion could compel the company to maintain it under such circumstances, and such coercion would be nothing less than illegal confiscation of property.

"Nor can the Legislature make an insurance company of the Department, contrary to its intent and purposes, by changing the contract, as the making of contracts between parties is beyond the pale of legislative authority.

"As has already been shown, the contract is not *per se* against public policy, and no statute can declare it so unless such statute has in view the public safety, health, morals, welfare or convenience, and reasonably tends to accomplish its end. I am utterly unable to see where the statute here under consideration has the remotest tendency to accomplish any such result; on the other hand, it appears to me to have just the opposite effect. The contract cannot be prohibited unless it be against the general public welfare, but to the only portion of the public interested both the Courts and reason declare it is highly beneficial; hence the statute cannot be said to be a proper exercise of the police power, as the Legislature cannot arbitrarily invade personal rights and declare beneficial contracts to be prohibited. No law prohibiting that which is harmless in itself, or commanding that to be done which does not tend to promote the health, safety or welfare of society can be sustained. 8 Cyc., 865,

note; *Ex parte Whitwell,* 35 Am. St. Rep., 152, 19 L. R. A., 727 (Cal.); *Toledo, etc., R. Co.* v. *Jacksonville,* 16 Am. Rep., 611 (Ill.).

"But freedom to enter into contracts that are in no way inimical to the public welfare is both a liberty and a property right secured alike to all persons, both natural and artificial, and cannot be encroached upon by the State in the guise of an exercise of the police power.   It is an essential part of the rights of 'liberty' and 'property' guaranteed under the provisions of Section 5, Article I of the Constitution of the State of South Carolina, and Section 1 of Article XIV of the Amendments to the Constitution of the United States.   Under these guarantees any corporation given the right to own property possesses as an inseparable incident to that right the right to make all necessary and reasonable contracts for the management of that property. Likewise, any employee of such corporation has the right to make any contract beneficial to him so long as such contract is not opposed to public policy, and this right cannot be taken away by legislative action.

"In the leading case of *Allgeyer* v. *Louisiana,* 165 U. S., 578, 41 L. Ed., 832, the Supreme Court of the United States thus declares the law:

" 'The liberty mentioned in that amendment (14th) means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter upon all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned.'

"This case was followed in *Lochner* v. *New York,* 198 U. S., 45, 49 L. Ed., 943, wherein the same Court declared

unconstitutional the statute of New York limiting the hours of labor of bakers, saying:

" 'We think that such a law as this, although passed in the assumed exercise of the police power, and as relating to the public health, or the health of the employees named, is not within the power, and is invalid. The act is not, within any fair meaning of the term, a health law, but is an illegal interference with the rights of individuals, both employers and employees, to make contracts regarding labor upon such terms as they may think best, or which they may agree upon with the other parties to such contracts. Statutes of the nature of that under review, limiting the hours in which grown and intelligent men may labor to earn their living, are mere meddlesome interferences with the 'rights of the individual, and they are not saved from condemnation by the claim that they are passed in the exercise of the police power and upon the subject of the health of the individual whose rights are interfered with, unless there be some fair ground, reasonable in and of itself, to say that there is material danger to the public health, or to the health of the employees, if the hours of labor are not curtailed. If this be not clearly the case, the individuals whose rights are thus made the subjects of legislative interference are under the protection of the Federal Constitution regarding their liberty of contract as well as of person; and the Legislature of the State has no power to limit their right as proposed in this statute. * * * The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose. *Minnesota* v. *Barber,* 136 U. S., 313, 34 L. Ed., 455; *Brimer* v. *Rebman,* 138 U. S., 78, 34 L. Ed., 862. The Court looks beyond the mere letter of the law in such cases. *Yick Wo* v. *Hopkins,* 118 U. S., 356, 30 L. Ed., 220. It is manifest

to us that the limitations of the hours of labor as provided for in this section of the statute under which the indictment was found, and the plaintiff in error convicted, has no such direct relation to, and no such substantial effect upon, the health of the employee as to justify us in regarding the section as really a health law. It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employees (all being men *sui juris*) in a private business, not dangerous in any degree to morals, or in any real and substantial degree to the health of the employees. Under such circumstances the freedom of master and employee to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with without violating the Federal Constitution.'

"In *Pittsburg, etc., R. Co.* v. *Moore,* 53 N. E., 290 (Ind.), it was contended that the statute of Indiana forbidding a common carrier to contract against his own negligence rendered the Relief Department contract void. The Court denied such a construction to the contract and used this strong language to show that such a contract is beyond legislative control:

" 'The right to contract upon subjects of themselves lawful, by persons *sui juris,* is beyond legislative control, so long as the right is exercised without injury to the public. The right to contract is inherent, and is inseparably connected with the right to own and control property, and is "a primary prerogative of freedom." 2 Whart. Cont., Sec. 1061. Therefore, in construing the act in question, it must be assumed that the Legislature intended to prohibit only such contracts as injuriously affect the public; and can it be said that a contract providing that in the future, when an injury may be suffered, the injured party shall then be free to choose which of two remedies will be most useful to him and most to be preferred, is against public policy? We do not see why.'

"And in *Pittsburg, etc., R. Co.* v. *Cox,* 45 N. E., 641, 35 L. R. A., 507 (Ohio), the Supreme Court of Ohio had this to say of the validity of this particular contract:

" 'The liberty of contract, being one of those rights secured by our Constitution, is not to be restrained upon any insufficient or mere fanciful conceit of what may possibly happen. The citizen who is *sui juris* has a right to make a contract beneficial to himself, when neither immoral, fraudulent, nor illegal, and he should not be restrained in the exercise of such right, unless the public welfare clearly compels it. Nor should the employment of corporate capital, where its use is for beneficial purposes, be interfered with, unless the public welfare clearly demands such interference. If the laborer, having in mind the future, and desiring to provide against a condition of sickness or accident, joins a beneficial association having insurance features, and devotes a portion of his monthly earnings to that purpose; and if, on the other hand, the corporation, actuated by a desire to advance its material prosperity by attaching its employees the more firmly to its interests, and by the humane purpose of contributing from its earnings to their material welfare, or acting from any other motive, good or bad, becomes a party to such contract, and renders in effort and money valuable assistance in effecting its beneficial purposes, why should the law assume, unreasonably and arbitrarily, to deny the exercise of these rights? We think it should not, and we fail to perceive how the contract in question contravenes any interest of the public.'

"In 1890 the Legislature of Ohio passed an act similar to that here under consideration, for the purpose of prohibiting the Relief Department contract. In a well-reasoned opinion this act was declared unconstitutional by the Circuit Court of the United States for the Northern District of Ohio, in the case of *Shaver* v. *Pennsylvania Co.,* 71 Fed., 103. The Court said:

" 'Now, if employees desire to enjoy the benefits of such contracts, they should have the right to make them. They

are capable of deciding for themselves whether they want to contract for such protection. *It is not within the powers of a Legislature to assume that this class of men need paternal legislation, and that, therefore, they will protect them by depriving them of the power to contract as other men may* \* \* \* This act has been declared unconstitutional in the case of *Cox* v. *Railway Co.,* 33 Ohio Law J., April 22, 1895, in a well-considered opinion by Judge Dilatush, of the Warren County Court of Common Pleas; and the Court reaches that conclusion because the said act violates Section 1, Article I, of the Bill of Rights, as interfering with the right of private contract.'

"Again:

" 'The act seems to assume that a large class of the citizens of the State—namely, those employed by railroad corporations—are incapable of making contracts for their own labor. As hereinbefore stated, this contract shows on its face, not only that no unfair advantage is taken of the employees, but that *the contract, in its broadest and fullest sense, is a beneficial one, intended for their protection and assistance.* If in some cases it proves unsatisfactory to the employee insured, that is in itself no evidence that the contract is of an unconscionable nature or unfair in its provisions. Neither is it a sufficient pretext to assume that all such contracts need the supervision of the legislative body, or that so large a class of citizens should be restricted in their right of personal liberty.' (Italics added.)

"Speaking of the validity and construction of the Relief Department contract, Judge Adams, in *Hamilton* v. *St. Louis, etc., R. Co.,* 118 Fed., 94, uses this language:

" 'The contract in question neither constrains him to forego his legal action nor does it in any manner lessen the amount of recovery or limit the liability of the defendant in case he elects to resort to the Courts for redress. I find, therefore, no reason for holding that the statute is violated by the contract pleaded by the defendant in this case. This same question has been before the Courts, both national and

State, in several cases wherein similar statutes of other States have been construed, and in every case, so far as my research has enabled me to investigate, the statute has either been held inapplicable to such contracts, or, *if applicable, to be void, because in violation of the Fourteenth Amendment to the Constitution of the United States, in that it deprives persons affected by it of their property (that is, liberty to contract) without due process of law.'* (Italics added.)

"And so I might go on and indefinitely multiply quotations to the effect that the right to contract upon subjects in no wise detrimental to the general public by persons *sui juris* is both a property right and a liberty and can not be taken away by legislation assumed to be enacted under the police power; but it is unnecessary to encumber this opinion further. So sacred is this right that no statute abridging it can stand unless it has for its object the promotion of the public welfare, safety, health, morals or convenience; and unless such object, and means appropriate to its attainment, be clearly shown, the right of contract must stand and the statute must fall. As was said by Mr. Justice Harlan in *Connolly* v. *Union Pipe Co.,* 184 U. S., 540, 46 L. Ed., 679: 'As the Constitution of the United States is the supreme law of the land, anything in the constitutions or statutes of the States to the contrary notwithstanding, a statute of a State, even when avowedly enacted in the exercise of its police powers, must yield to that law. No right granted or secured by the Constitution of the United States can be impaired or destroyed by a State enactment, whatever may be the source from which the power to pass such enactment may have been derived.' Authority for these great cardinal principles of the law on the liberty of contract additional to what has already been cited is found in: *In re Grice,* 79 Fed., 627; *Niagara Ins. Co.* v. *Cornell,* 110 Fed., 816; *State* v. *Loomis,* 115 Mo., 307; *State* v. *Julow,* 50 Am. St. Rep., 443 (Mo.); *State* v. *Kreutzberg,* 91 Am. St. Rep., 934 (Wis.); *Street* v. *Varney Electrical*

Co., 98 Am. St. Rep., 325 (Ind.); *Mathews* v. *People,* 95 Am. St. Rep., 241 (Ill.); *Ramsey* v. *People,* 142 Ill., 80; *Frorer* v. *People,* 141 Ill., 171; *Richie* v. *People,* 46 Am. St. Rep., 315 (Ill.); *Chicago* v. *Netcher,* 75 Am. St. Rep., 93 (Ill.); *Ruhstrat* v. *People,* 76 Am. St. Rep., 30 (Ill.); *Fiske* v. *People,* 188 Ill., 206; *People* v. *Warden,* 68 Am. St. Rep., 763 (N. Y.); *Palmer* v. *Tingle,* 45 N. E., 313 (Ohio); *In re Preston,* 81 Am. St. Rep., 642 (Ohio); *City of Cleveland* v. *Cont. Co.,* 65 N. E., 885 (Ohio); *Commonwealth* v. *Perry,* 31 Am. St. Rep., 533 (Mass.); *Braceville* v. *People,* 37 Am. St. Rep., 209 (Ill.); *State* v. *Goodwill,* 25 Am. St. Rep., 863 (W. Va.); *People* v. *Common Council,* 38 N. W., 470 (Mich.); *People* v. *Gillson,* 4 Am. St. Rep., 465 (N. Y.); *People* v. *Marx,* 52 Am. Rep., 34 (N. Y.); *Godcharles* v. *Wigeman,* 6 Atl., 354 (Pa.); *Re House Bill,* 39 Pac., 431 (Col.); *Re Morgan,* 77 Am. St. Rep., 269 (Col.); *Johnson* v. *Mining Co.,* 78 Am. St. Rep., 17 (Cal.); *State* v. *Dalton,* 84 Am. St. Rep., 818 (R. I.); *Young* v. *Commonwealth,* 45 S. E., 327 (Va.); *Seattle* v. *Smith,* 79 Am. St. Rep., 939 (Wash.); *Gillespie* v. *People,* 80 Am. St. Rep. 176 (Ill.); *People* v. *Coler,* 82 Am. St. Rep., 605 (N. Y.); *Harding* v. *People,* 52 Am. St. Rep., 344 (Ill.); *People* v. *Hawkins,* 68 Am. St. Rep., 736 (N. Y.); *Cleveland* v. *Clements Bros., etc., Co.,* 93 Am. St. Rep., 670 (Ohio); *Ex parte Dickey,* 103 Am. St. Rep., 82 (Cal.); *Underhill* v. *Murphy,* 111 Am. St. Rep., 262 (Ky); *Republic Iron and Steel Co.* v. *State,* 66 N. E., 1005 (Ind.); *Greenwich Ins. Co.* v. *Carroll,* 125 Fed., 121; *Toney* v. *State,* 109 Am. St. Rep., 23. And these rights belong to corporations as well as individuals: *Butcher's, etc., Co.* v. *Crescent City, etc., Co.,* 111 U. S., 745; *Pembina Mining Co.* v. *Penn.,* 125 U. S., 181; *R. Co.* v. *Ellis,* 165 U. S., 150; *Smyth* v. *Ames,* 169 U. S., 466; 2 Elliott on Railroads, Sec. 659.

"In the light of these principles, escape is impossible from the conclusion that the act here under consideration is an illegal interference with the freedom of contract guaranteed

by the Federal and State Constitutions, and therefore null and void.

"I am deeply sensible of the hesitancy a Court should feel in declaring an act of the Legislature unconstitutional, but in this case I can see no other alternative.    Here is a contract of highly beneficial character and undoubted validity attempted to be struck down by a statute that can be referred to not a single source of authority under the police power, and which is detrimental rather than beneficial to the only portion of the public affected.    My duty to uphold the Constitution in such a case by declaring the statute void seems to be clear, and I feel no hesitation in so pronouncing it.

"This being so, the former judgment is an absolute bar to this action.

"2. The second question raised in the stipulation is whether the 'disability' mentioned in the contract of membership in the Relief Department means total inability to work, or mere inability to perform the class of labor in which the member was engaged at the time of his injury

"The question, as I view it, presents little difficulty.    In Rule 46 of the 'Regulations of the Relief Department' this statement is found: 'Wherever used in these regulations, the word "disability" shall be held to mean *physical inability to work,* by reason of sickness or accidental injury, and the word "disabled" shall apply to members thus *physically unable to work.*'    (Italics added.)    In the case at bar it is admitted that 'the plaintiff is unable to pursue the business in which he was engaged when he was injured, but is not disabled from doing work of a lighter character.'    But ability to perform 'work of a lighter character' is utterly incompatible with *physical inability to work,* for that would involve a contradiction in terms.    The regulation does not say physical inability to work in the *line in which he was formerly engaged,* and the Court cannot read such a meaning into it. A party may not be physically able to follow one line of work, yet thoroughly able to follow another and more lucrative one.    Plainly no such case as this was intended to be

provided for by the payment of disabled benefits; hence I hold that the disability referred to means physical inability to perform any labor.

"These considerations entirely dispose of the second and last issue submitted to the Court.

"It is therefore ordered, adjudged and decreed that the defenses interposed by the defendant be sustained, and the complaint be dismissed with costs."

From this decree, plaintiffs appeal.

*Messrs. Legare & Holman,* for appellant, cite: *As to the constitutionality:* 187 U. S., 198; 203 U. S., 243; 68 S. C., 339; 73 S. C., 174; 194 U. S., 269.

*Messrs. Willcox & Willcox, T. M. Mordecai, W. Huger FitzSimons* and *Henry E. Davis,* contra.   The argument for respondent was presented by Messrs. Willcox & Willcox and Henry E. Davis, and since the Circuit decree cites practically all the authorities cited by them they are not printed here.

The opinion in this case was filed  March 20, 1908, but remittitur held upon petition for rehearing until April 22, 1908.

### STATEMENT OF FACTS.

This is an appeal from a judgment, declaring the act hereinafter mentioned unconstitutional.

The record contains the following statement of facts: "The plaintiff, J. R. Sturgiss, was injured in November, 1904, while in the employment of the defendant company, as a carpenter, and he brought an action for the injuries sustained, alleging that the same was caused by and through the negligence of the defendant company.

"That as a result of said action, the plaintiff succeeded in recovering from the defendant the sum of twenty-seven hundred dollars ($2,700) for the alleged injuries sustained, and the same was paid to the plaintiff by the defendant,

and a full and complete release and discharge was taken for all claim and demand against the said defendant for said injuries. The plaintiff at the time he received said injuries was a member of what is known as the Hospital and Relief Fund of the defendant company, all of which will more fully and at large appear by the Hospital Relief Fund contract, which is appended to this agreement and made a part thereof. The said contract provides, in case of injury, that the plaintiff was to receive one dollar a day for fifty-two consecutive weeks, and thereafter one-half this amount, so long as his disability continues. The plaintiff is unable to pursue the business in which he was engaged when he was injured, but is not disabled from doing work of a lighter character.

"It is hereby stipulated that two questions shall be submitted to the Court for determination.

1. "Whether the act of the General Assembly of this State, allowing a party, a member of the Hospital and Relief Fund, to recover benefits from the said Hospital and Relief Fund, notwithstanding his compensation for damages, is constitutional and valid.

2. "Whether the disability mentioned in the contract known as the Hospital and Relief Fund has reference to the work at which the plaintiff was engaged in at the time he was injured, or does it apply to any class of labor he is now able to perform."

The act which was held to be unconstitutional is as follows, 24 Stat., 962:

Section 1. "Be it enacted by the General Assembly of the State of South Carolina, that when any corporation, firm or individual runs or operates what is usually called a relief department for its employees, the members of which are required or permitted to pay dues, fees, money or other compensation, by whatever name called, to be entitled to the benefit thereof, upon the death or injury of the employee, a member of such relief department, such corporation, firm or individual so running or operating the same, be, and is hereby, required to pay to the person entitled to the same

the amount it was agreed the employee, his heirs or other beneficiary under such contract should receive from such relief department, the acceptance of which amount shall not operate to estop, or in any way bar, the right of such employee or his personal representative, from recovering damages of such corporation, firm or individual, for personal injury or death caused by the negligence of such corporation, firm or individual, their servants or agents, as are now provided by law; and any contract or agreement to the contrary, or any receipt or release given in consideration of the payment of such sum, is and shall be null and void.

Section 2. "That all acts inconsistent with this act are hereby repealed."

The application for membership in the Hospital and Relief Fund must set forth the following agreement on the part of the applicant:

"I agree that the said company, by its proper agents, and in the manner provided in said regulations, shall apply as a contribution from any wages earned by me under said employment, the sum of          per month, for the purpose of securing the benefits provided in the regulations, for a member of the Relief Fund of the          class, with additional death benefit of the first class." * * * "It also agree, that in consideration of the amounts paid and to be paid by said company for the maintenance of said Relief Department, and of the guarantee by said company of the payment of said benefits, the acceptance by me of benefits for injury shall operate as a release and satisfaction of all claims against said company, and all other companies associated therewith, in the administration of their relief departments, for damages arising from or growing out of said injury; and further, in the event of my death no part of said benefit or unpaid disability benefit shall be due or payable unless and until good and sufficient releases shall be delivered to the superintendent of the said Relief Department, of all claims against said Relief Department, as well as against said

company, and all other companies associated therewith as aforesaid, arising from or growing out of my death, said releases having been duly executed by all who might legally assert such claims; and further, if any suit be brought against said company, or any other company associated therewith as aforesaid, for damages arising from or growing out of injury or death occurring to me, the benefits otherwise payable, and all obligations of said Relief Department and of said company created by my membership in said Relief Fund, shall thereupon be forfeited without any declaration or other act by said Relief Department or said company."

## OPINION.

April 22, 1908. The opinion of the Court was delivered by

MR. JUSTICE GARY (after stating the facts). We will consider first whether the act is constitutional.

The statute was intended to remedy an evil that not only exists in this State but is so extensive throughout the land as to necessitate action on the part of the Federal government in the passage of an act entitled: "An act relating to liability of common carriers," etc., approved 11th June, 1906, the third section of which is as follows: "That no contract of employment, insurance, relief, benefit or indemnity from injury or death entered into by or on behalf of any employee, nor the acceptance of any such insurance, relief, benefit or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to or death of such employee: provided, however, that upon the trial of such action against any common carrier, the defendant may set off therein any sum it has contributed toward any such insurance, relief, benefit or indemnity that may have been paid to the injured employee, or in case of his death, to his personal representative."

Although the statute last mentioned has been declared unconstitutional, the third section thereof was not before the Court for construction.

The statute under consideration was enacted for the purpose of preventing railroad corporations (and other parties therein mentioned) from inaugurating schemes, the ultimate aim and practical effect of which are to enable the railroad company to bring such influence to bear upon its employees as will force them to surrender their claims for damages when they have sustained injury through the negligence of the company, against which it is not allowed by law to contract

When the regulations of the Hospital and Relief Fund are analyzed, it will be seen that they contemplate the result just mentioned

Not only do they provide that the employee who has paid his assessments, and thereby contributed to the creation and maintenance of said fund, shall be barred from recovering damages for negligence, if he accepts the benefit thereunder, but they likewise provide that his representatives shall not be allowed to bring an action for damages caused by the negligence of the corporation, if they accept the benefit of said fund.

Membership in the Hospital and Relief Fund creates the relation of trustee and *cestui que trust,* between the company and the employee, and, although the employee is assessed to maintain the fund, he is not allowed to receive a dollar of the money collected for that purpose, unless he surrenders his claim for damages, when he has been injured through the negligence of the corporation. The fiduciary relation established between the company and the employee places him practically at the mercy of the corporation; for it is a well-known fact that the employees are not persons, generally, of large means, and frequently are dependent entirely upon their salary or wages for a support.

What is the condition of the employee when he is injured through the negligence of the company? He realizes the

fact, that he has a beneficial interest in a trust fund, and being in need of the money, he is anxious to get it. He is informed, however, that he must surrender all other claims against the corporation. At this time he, perhaps, is suffering great mental and physical pain, his mind is not so clear as when in health, and the opportune time contemplated by the corporation has arrived, when he can be easily persuaded to relinquish his claim for damages arising out of negligence.

Public policy demands that the corporation shall not have the opportunity of taking advantage of its employees, through the fiduciary relations established between them with that end in view.

We only desire to say, in conclusion, that if the Hospital and Relief Fund is successfully operated, the practical result will be, that the railroad company will be enabled to liquidate claims for damages arising out of its negligence, with sums of money contributed, in the main, by its employees—an indirect way of contracting against its negligence. We do not *think,* however, that the question as to the constitutionality of the statute is controlling in this case; but as it fairly arises upon the record, was also made a paramount issue in the Circuit Court, and is of vital importance, we have followed the practice in other cases and have considered it.

It is true the statute provides that the acceptance of benefits under the Hosptial Fund shall not operate to estop or in any manner bar the right of the employee from recovering damages for injury caused by the negligence of the corporation; but it does not provide that a receipt or release given in satisfaction of a claim arising out of negligence shall be null and void, and that even after full compensation for negligent injury, the employee shall still have the right to recover his beneficial interest in the Hospital Fund although he had previously relinquished it.

The statute is therefore inapplicable to this case.

We proceed to consider the question whether the disability mentioned in the contract has reference to the work at which the plaintiff was engaged when he

was injured.    (The conclusion just announced, however, renders the question speculative.)

In Rule 45 of the "Regulations of the Relief Department," is the following provision: "Whenever used in these Regulations, the word 'disability' shall be held to mean physical inability to work, by reason of sickness or accidental injury, and the word 'disabled' shall apply to members thus physically unable to work."

This provision has reference to physical inability to work whether caused by sickness or *accidental injury.*

There is scarcely a conceivable case where a person sustaining accidental injury is not able to do some kind of work, even when deprived of both arms or both legs.

If the construction of the said provision by his Honor, the presiding Judge, is correct, then a person accidentally losing both arms or both legs would not be entitled to the benefit of the fund the moment he was able to do any kind of work. He would not even be entitled to any part of the fund whatever, if he could do work of any kind.    We cannot accept a construction that would bring about such injustice.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE POPE *concurs.*

MR. JUSTICE JONES.    With respect to the second question presented, I agree with Justice Gary that the Circuit Court was incorrect in construing the terms "physical inability to work" to mean "physical inability to perform any labor."    The language must not be construed as if isolated from the context, but must be construed in the light of the circumstances and the regulations of the Relief Department.    Under regulation 45 the decision as to when members are disabled and when they are able to work rests with the medical officers of the department, and under regulation 54, if a member reported by the medical

examiner as able to work is not able to work on the day set, he must so report to the medical examiner, otherwise he shall not be considered disabled on or after the day set for his *return to work.* Under regulation 57 the time of disability from sickness or injury begins on the day after the last wage day and, under regulation 45, ends when the medical officers decide that the member is able to work. The Relief Department contract grows out of the fact that the employed member is under a contract of service with the employing member of the Relief Department, and the dues and benefits are apportioned according to classes based upon the wages of employed members. Hence the words "physical inability to work" must mean physical inability to resume work within the scope of the original service or employment.

With respect to the question as to the constitutionality of the act of March 7, 1905, I agree with the Circuit Court, and nothing can be added to the able and elaborate argument of the Court showing that the statute is unconstitutional, if construed as an attempt to annul the contract involved in this case.

It must be remembered that the plaintiff, as permitted by the Relief Department contract, has recovered of defendant in a suit at law $2,700, as full compensation for all injury sustained by the negligence of the defendant, and has executed a full release and discharge for all claim against defendant for such injury. Hence discussion of the statute, in so far as it may be supposed to forbid a contract which would exonerate defendant for negligence, is not strictly applicable.

The concrete question is whether plaintiff, after receiving full compensation for injury resulting from the defendant's negligence, can sue defendant as guarantor of the Relief Department contract and recover the benefits provided in such contract for such injury, notwithstanding his release of the department from all claim for such injury and his express stipulation that "if any suit shall be brought against said

company * * * for damages arising from or growing out of injury * * * occurring to me, the benefits otherwise payable and all obligations of said Relief Department and of said company, created by my membership in said Relief Fund, shall thereupon be forfeited," etc.

The statute does not declare that a relief department such as is shown in this case is obnoxious to the public health, morals, safety or welfare. Indeed, it assumes the beneficial character of such an association by requiring the payment of the "benefits" to those enabled to receive them under the contract. Is plaintiff entitled to recover the benefits under the contract? No, he has expressly stipulated not to be entitled to recover them upon the happening of the conditions existing in this case. His action is upon the contract. Shall he be allowed to enforce the contract in so far as it benefits him and repudiate it in so far as it benefits the other party? Surely it would be very unjust to allow this. The statute goes on to provide that the acceptance of benefits shall not estop from recovering damages for negligent injury or death and declares void any contract to the contrary and any receipt or release given in consideration of the payment of such benefits, but it nowhere declares that a member after full compensation for the negligent injury is still entitled to recover of the same defendant the benefits which he agreed to waive by accepting compensation in such other mode.

In my opinion the statute in question should not be construed to attempt to annul such stipulation as the above, but if it should be so construed, I think it clearly void, because it has no real or substantial relation to any subject of police regulation, and unreasonably abridges the right of contract.

The judgment of the Circuit Court should be affirmed.

MR. JUSTICE WOODS. I concur in the opinion of Mr. JUSTICE JONES. I think this case falls within the principle of the case of *Adair* v. *U. S.*, decided by the Supreme Court of the United States, January 27, 1908.

April 22, 1908.   PER CURIAM.   After careful consideration of the within petition, the Court is satisfied that no material question of law or of fact has either been overlooked or disregarded.

Upon the question of constitutional law involved, the entire Court is not agreed (as is required by Section 12, of Art. V, of the Constitution) and that question cannot be regarded as decided.   And as the justices concur in affirming the judgment of the Circuit Court upon other questions, it is not necessary to call the Circuit Judges to the assistance of the Supreme Court.

It is, therefore, ordered that the petition be dismissed, and that the order heretofore granted staying the remittitur be revoked.